| | |
|---|---|
| DISH NETWORK L.L.C., <br><br> Plaintiff, <br><br> v. <br><br> ELLAS TV, INC., and MARIO PAPPAS, <br><br> Defendants. | No. 16 CV 4813 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Defendants Ellas TV and Mario Pappas redistributed Dish Network signals through their own subscription-based television service for approximately five months, and Dish sued them for willfully violating the Federal Communications Act, 47 U.S.C. § 605(a). Dish moves for summary judgment on its claim and seeks attorneys' fees and costs, a permanent injunction, as well as statutory and enhanced damages. That motion is granted in part.

## I. Legal Standards

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must view all facts and reasonable inferences in the light most

favorable to the non-moving party. *Roh v. Starbucks Corp.*, 881 F.3d 969, 973 (7th Cir. 2018).

**II.     Background**

Dish Network, a television service provider, has over thirteen million subscribers in the United States. [29-3] ¶ 2.[1] Dish purchases the distribution rights for programming like movies, sports, and other entertainment from network providers and other rights-holders, and Dish transmits that programming through its direct broadcast satellite system.[2] *Id.* ¶¶ 40–42. Specifically, Dish transmits its programming in a digitized, compressed, and scrambled format to satellites located in geo-synchronous orbit above Earth. *Id.* ¶ 43. Those satellites relay the encrypted signal back to Earth where Dish subscribers' equipment receives the signal. *Id.* ¶ 44. The subscribers' equipment, namely a receiver and a smartcard, convert Dish's encrypted satellite signal into programming that can be viewed on the subscriber's attached television. *Id.* ¶ 45.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from defendants' responses to Dish's Local Rule 56.1(a) statements, [29-3], and Dish's responses to defendants' Local Rule 56.1(b)(3)(C) statements, [30-3], where both the asserted fact and the opposing party's response are set forth in one document. When the parties raised arguments in their statements, included additional facts in their responses or replies, failed to support their statements by admissible evidence, or failed to cite to supporting material in the record, I disregarded those portions of those statements, responses, or replies. Facts that were not properly controverted are deemed admitted.

[2] Defendants concede that Dish used state-of-the-art technology to maintain customer satisfaction, and that unauthorized distribution of Dish's signals causes harm to its ability to control quality assurance and security protocols. [29-3] ¶ 79.

2

Relevant to this case, Dish entered into a licensing agreement in November 2015 to obtain the rights to transmit the Sport Plus channel to Dish subscribers in the United States.³ *Id.* ¶¶ 70–71. Dish subscribers were able to access the Sport Plus channel if they purchased the Greek language package for $29.99 per month. *Id.* ¶ 71. In order to purchase the Greek language package, however, Dish required its subscribers to also purchase another package—subscribers had their choice of either a domestic package ($39.99 per month), an international package ($10.99 per month), or a Chinese package ($10.99 per month). [29-3] ¶¶ 71–72. In reality, that meant that a Dish subscriber had to pay a minimum of $39.99 per month to access the Sport Plus channel. *Id.* ¶ 72. Dish did not sublicense its distribution rights in foreign language programming, including the Greek language package, which carried the Sport Plus channel.⁴ *Id.* ¶ 77.

A former Dish retailer named Mario Pappas founded a rebroadcasting company named Ellas TV in 2010.⁵ *Id.* ¶¶ 11–12. One year after founding the company, Pappas publicly launched Ellas with approximately twenty television channels. *Id.* ¶ 12. Ellas streamed programming over the internet, and its customers viewed that programming either through television-receiving equipment

---

³ The Sport Plus channel played primarily soccer games, including Greece's highest professional soccer league. [29-3] ¶ 62. The Greek matches were televised from November 2015 through May 2016. *Id.*

⁴ Defendant objects to this statement of fact, arguing that Dish did not produce discovery regarding its rights to the Sport Plus channel, *see* [29-3] ¶ 77; but, in its supplemental filing, Dish attached an exhibit of an email from Dish's counsel to defendants' counsel attaching Dish's agreement with Artmer regarding Sport Plus, *see* [30-2] at 2.

⁵ From the founding of Ellas, Pappas served as the company's sole owner and president. [29-3] ¶¶ 6–7.

3

that Ellas provided ("Ellas TV box") or through an app on any compatible device ("Ellas TV GO"). *Id.* ¶ 5; [30-3] at 82. Subscriptions to Ellas's services ranged from $34.99 to $69.99 per month. *Id.* ¶ 16. According to Ellas's tax return, its total income in 2015 was in excess of $1,800,000. [27-11] ¶ 10. As of January 2016, Ellas had approximately two thousand subscribers to its box service and three hundred subscribers to its app service. [29-3] ¶ 15, [27-12] at 86:19–87:3.

With Ellas, Pappas sought to provide Greek television channels to individuals outside of Greece. [29-3] ¶ 31. Ellas obtained some channels through over-the-air antennas in Greece and redistributed those channels to its customers in the United States. *Id.* ¶ 14. Since there were no rights-holders for those channels, Ellas did not have to obtain permission or purchase distribution rights in order to redistribute those channels. [27-12] at 24:4–25:8. For several other channels, which had rights-holders, Pappas initially paid the distribution rights for those channels.[6] [29-3] ¶ 13. When the channel that Ellas had been using to provide its customers access to Greek soccer games stopped carrying those games, Pappas became interested in Sport Plus as an alternative way to show those games. [27-12] at 39:8–14, 42:11–14. Pappas did not contact Dish about licensing the channel because he did not think that Dish had the rights to that channel. *Id.* at 65:2–66:9.

In November 2015, Pappas began testing the quality of the Sport Plus channel on Ellas's app service. [30-3] at 84. He did this by tuning a Dish receiver to the Sport Plus channel, using a computer equipped with video cards and encoding

---

[6] Defendants stopped paying for those distribution rights in 2014 due to other litigation. [27-12] at 23:2–14.

4

software to re-encode the audio and video signal output, sending the re-encoded signal to his "middleware," and making the channel available on the app service (he said he did not realize it was accessible to "everybody's package on the product"). [27-12] at 46:21–47:18; [29-3] at 29.[7] Pappas said he chose to only test the Sport Plus channel on Ellas's app service because he did not have a lot of customers on that platform; he did not want to provide his customers on the box platform access to the channel before it was "a hundred percent ready." [27-12] at 47:22–48:7. In total, Pappas says that he distributed the Sport Plus channel on Ellas's app service from approximately November 2015 through January 2016. [27-12] at 52:6–24. In February 2016, Pappas began redistributing other sources' signal of the Sport Plus channel on Ellas's box service; this continued until May of 2016. *Id.* at 50:14–23.

In the midst of this testing and redistributing, Pappas received a letter from a law firm, dated December 3, 2015, regarding the unauthorized distribution of television programming. [27-12] at 2. The letter was sent on behalf of the firm's clients, Antenna Pay TV and Artmer; and it stated, in relevant, part that its clients "own or control exclusive rights under copyright to distribute" the Sport Plus channel in the United States. *Id.* Accordingly, the law firm explained "[w]e are writing to demand that you take immediate steps to address the extensive copyright infringement . . . that is occurring by virtue of your Ellas TV service." *Id.* The letter enclosed screenshots of Ellas TV's distribution of the Sport Plus channel. *Id.* It explained aspects of liability for copyright infringement. *Id.* at 2–3.

---

[7] Pappas subscribed to Dish's Greek language package under two Dish accounts. [29-3] ¶ 47. Together, those accounts had eight Dish receivers and eight Dish smartcards. *Id.* ¶ 48.

Pappas wrote a response letter to the firm five days later. Then, on January 28, 2016, the firm sent another letter to Pappas, acknowledging that Pappas "d[id] not believe the Sport Plus programming was owned by Artmer" and that he "request[ed] a basis upon which Artmer claims exclusive rights to the programming content," but that the firm's last letter certified that its clients held the exclusive distribution rights in the United States, so "[n]othing else [wa]s required." *Id.* at 10. Notwithstanding that fact, the firm enclosed a letter from Artmer confirming that it held the exclusive rights involved. *Id.* In sum, the letter expressed the firm's disagreement with Pappas's positions, explained that Ellas did not have any distribution rights to the Sport Plus channel, and demanded that he cease and desist all of Ellas's redistribution of Sport Plus. *Id.* at 9–10.

After receiving the letters, Pappas tried to delete the Sport Plus channel from its box service, but was unsuccessful due to technical difficulties. [29-3] ¶ 66; [27-12] at 69:8–24. But, Pappas did not believe that the firm's clients had the rights to the channel given that other providers had it on their websites, so he decided to find other sources that could provide the channel. [29-2] at 42:13–43:3. He also decided against doing anything further to delete the channel or to prevent its continued distribution, again, because he disbelieved the claims of the Sport Plus rights-holders. [29-3] ¶ 68. As such, defendants continued to distribute Sport Plus after they received the letters. *Id.* ¶ 69.

Dish investigated defendants' distribution of Sport Plus on Ellas's services. *Id.* ¶ 46. First, Dish used a three-dot test to confirm that the Sport Plus channel it

6

was seeing on Ellas's box service actually originated from a Dish account. [29-2] at 57:14–58:1. The three-dot test is channel-specific; it goes to every Dish account that has access to the Sport Plus channel, so Dish cannot identify from which account the channel's signal originated. *Id.* at 58:2–15. In order to figure out which account is re-distributing the channel, Dish can use its billing system simulator to send a hard coded pay-now message to an individual smartcard. [27-5] ¶ 4. When Dish sends that type of message, it appears on the device that is linked to the receiver and the smartcard of the suspected Dish account. *Id.* The message will also appear on any devices that receive a redistributed signal from the suspected Dish account's receiver. *Id.* Dish identified eight suspected smartcards, and on December 17, 2016, Dish inputted those smartcard numbers into the billing system simulator and set pay-now messages to each of the eight smartcards. *Id.* ¶¶ 4–5.

Dish's investigator had a subscription to Ellas's app service from approximately December 2015 to January 2016, and then he purchased an Ellas box in March 2016. [29-2] at 52:25–53:13, 58:16–19. The investigator personally accessed Ellas's app once every couple of days while his subscription lasted, *id.* at 52:25–53:7; and he personally accessed Ellas's box dozens of times from approximately March, when he obtained the box, and April, when Dish disconnected Pappas's Dish accounts, *id.* at 62:11–18. When Dish sent pay-now messages to Pappas accounts on December 17, 2015, March 16, April 6, April 19, and April 29, 2016, the investigator simultaneously monitored Ellas's services and confirmed that they were streaming a Dish signal. [27-3] ¶ 7. Finally, when Dish disconnected

7

Pappas's Dish accounts on April 29, 2016, [29-3] ¶ 58, the investigator watched Ellas's box service transition from displaying the Sport Plus channel to displaying an error message that stated: "Programming Not Authorized." [27-3] ¶ 19. When Dish disconnects an account, that exact message appears on any devices connected to that account. *Id.* ¶ 18. That same day, Dish filed this lawsuit against defendants. *See* [1].

### III. Analysis

Section 605(a) prohibits a person receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio from "divulg[ing] or publish[ing]" the contents of the communication for the individual's own benefit or for the benefit of another unauthorized individual. 47 U.S.C. § 605(a). Courts in this district have interpreted that subsection of the statute as forbidding the unauthorized transmission of protected communications, even when the communications were received legally. *Kingvision Pay Per View, Ltd. v. Julian Corp.*, 1996 WL 496600, *2 (N.D. Ill. 1996) (citing *That's Entm't v. Old Bridge Tavern*, 1996 WL 148045, *2 (N.D. Ill. 1996)). There is no dispute that Dish's satellite broadcasts constitute protected communications. *See United States v. Norris*, 88 F.3d 462, 468 (7th Cir. 1996). Rather, the dispute is over whether Dish can establish that defendants redistributed Dish's signal; and if so, how many violations did defendants commit, and how the award of damages should be calculated.

Defendants admitted to using Dish's signal to redistribute Sport Plus on Ellas's app service from approximately November 2015 to January 2016. While they

also admitted to redistributing Sport Plus on Ellas's box service from February through May of 2016, they argue that they obtained that feed from other sources and that they had no knowledge as to whether that feed originated from a Dish signal. Defendants argue that there is no evidence that the Sport Plus channel on Ellas's box originated from Pappas's Dish receivers or that defendants knowingly redistributed Dish's signal. What defendants fail to understand, though, is that Dish does not need to prove that Ellas's services used a Dish signal that originated specifically from Pappas's receivers. 47 U.S.C. § 605(a). There is also no requirement that defendants had knowledge of which signal they were redistributing. *That's Entm't*, 1996 WL 148045 at *2. All that is required is that defendants divulged Dish's signal without authorization and benefited therefrom. It is clear from the undisputed record that these requirements were met—defendants violated § 605(a) by offering the Sport Plus channel on Ellas's services in 2015 and 2016.

The parties debate the number of times defendants violated the statute by engaging in this behavior. With respect to Sport Plus appearing on Ellas's app service, defendants argue that the redistribution was never constant because a lack of bandwidth caused the redistribution to "go off and on." *See* [27-12] at 48:24–49:17. When redistribution went "off," Pappas did not have to manually restart it; once more bandwidth became available, redistribution of the Sport Plus also became available. *Id.* at 49:18–50:13. Defendants do not offer any accounting for when the channel was and was not available, though. On the other hand, Dish offers evidence

9

that its investigator, who had subscribed to Ellas's app service, observed the Sport Plus signal each time he used Ellas's app, which was every few days during that approximate two-month period. *See* [30-2] at 15:25–16:7.[8]

With respect to Sport Plus appearing on Ellas's box service, defendants argue that Dish only has proof that the redistribution originated from a Dish signal on five occasions, namely December 17, 2015, March 16, April 6, 19, and 29, 2016. Yet, Dish insists that defendants used a Dish's signal to redistribute the Sport Plus channel every day from December 3, 2015 to April 29, 2016.[9] To support this assertion, Dish points to evidence that Dish's investigator frequently accessed the channel through Ellas's box, and evidence that the Ellas box service lost the ability to display the Sport Plus channel the precise moment when Dish disconnected Pappas's accounts. I need not resolve this debate, however, because defendants' failure to timely respond to Dish's Requests for Admissions provides a resolution.

Federal Rule of Civil Procedure 36(a) provides that a party served with a written request to admit the truth of matters within the scope of discovery has thirty days to file an answer or objection. If a party does not respond or object, the matters are deemed admitted. *Id.* "A matter admitted under this rule is conclusively

---

[8] Defendants' motion to strike, [32], is denied; accordingly, I rely on the declaration and attached exhibits that Dish submitted with its reply brief, *see* [30-1]–[30-2]. The declaration and the attached exhibits are limited in scope and they respond to new assertions in defendants' Statement of Additional Undisputed Material Facts, which is permissible under the Local Rules. *See* L.R. 56.1(a), (b)(3)(B); *see also Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1134 n.* (7th Cir. 1996). Relatedly, Dish's motion to withdraw, [31], is granted.

[9] Dish explained that it used December 3, 2015 as a "conservative start date for calculating the number of days that Pappas distributed the DISH signal." [27-1] at 9. That start date coincides with the date of the first cease and desist letter that Pappas received. *See* [27-12] at 2.

10

established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b); *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 607 (7th Cir. 2008). Here, Dish served its First Set of Requests for Admission to defendants on June 30, 2016. [27-11] ¶ 6. Defendants' responses were due on August 2, 2016. *Id.* Defendants did not file a response, nor did they request an extension of time to file a response. *Id.* Instead, ten days after the deadline, both defendants filed responses. *Id.* ¶¶ 7–8. As a result, the matters contained within Dish's First Set of Requests for Admissions are deemed admitted, even though defendants deny some of those matters in their untimely responses.[10]

The admitted facts are as follows: Dish's signal was the source of the Sport Plus channel that was distributed through the Ellas's services, [27-12] at 98, ¶ 20, and Ellas distributed the Sport Plus channel to its customers from December 3, 2015 through April 29, 2016, *id.* at 98, ¶ 16. Accordingly, I find that defendants redistributed Dish's Sport Plus signal on Ellas's services for 148 days.

Defendants argue that there is no evidence that any customer accessed the Sport Plus channel through Ellas's services because defendants did not include the channel in any of the packages it sold to customers, never collected a fee for the channel, and did not advertise the channel. Again, these are not required elements of Dish's claim against defendants. Nevertheless, Dish has evidence that its investigator accessed Sport Plus dozens of times through Ellas's services. Dish also

---

[10] At first blush, this result may seem harsh; but, Dish flagged this issue in its opening summary judgment brief, *see* [27-1] at 9 n.4, and defendants did not address it in their response brief. Defendants have waived any argument against enforcing Rule 36 as written.

11

has evidence that defendants advertised one of its packages as having "30 Sports Channels," [30-2] at 45, and that the Sport Plus channel appeared in Ellas's channel guide on channel number 220. [27-3] ¶ 21. While there is no evidence that defendants collected a fee specifically for the Sport Plus channel, it is undisputed that defendants collected a subscription fee before allowing individuals to access to Ellas's channels, which included Sport Plus.

Dish has established that defendants benefitted financially from transmitting Dish's protected communications; thus, Dish is entitled to summary judgment on the issue of whether defendants violated § 605(a). The imposition of liability is against both defendants. Pappas faces individual liability not only because Pappas was directly involved in every aspect of the violation, but also, because he was a corporate officer who participated in the activity and who had a financial interest in the activity. *See Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1150 (7th Cir. 1992); *see also Joe Hand Promotions, Inc. v. Wright*, 963 F.Supp.2d 26, 28 (D. D.C. 2013) (noting the "large body of cases" that hold corporate officers liable for a corporation's infringing acts under the statute without veil piercing as long as the officer had a "right and ability to supervise" the violations, and a direct financial interest in the misconduct) (citations omitted).

When a party successfully establishes a violation of § 605, that party is entitled to a full recovery of costs, as well as injunctive relief and damages, at the court's discretion. 47 U.S.C. § 605(e)(3)(B). For damages, the prevailing party may recover either actual damages or statutory damages. *Id.* § 605(e)(3)(C)(i); *That's*

*Entm't*, 1996 WL 148045 at *3. Here, Dish is pursuing statutory damages. The statute permits recovery of statutory damages between $1,000 and $10,000 per violation. 47 U.S.C. § 605(e)(3)(C)(i)(II). If the violations were willful, done for purposes of commercial advantage, or in furtherance of private financial gain, the court may increase statutory damages up to $100,000 for each violation. *Id.* § 605(e)(3)(C)(ii).

Dish asserts that each day that a signal is received and divulged constitutes a new violation; thus, Dish charges defendants with committing 148 violations. [27-1] at 9–10. To support this proposition, Dish cites a District of New Jersey case. *See Primetime 24 Joint Venture v. Telecable Nacional*, 1990 WL 598572, *3 (D. N.J. 1990) ("Plaintiff contends that it is entitled to an award for each day that defendant pirated the New Jersey satellite signal. There is support for the proposition that each unauthorized interception and retransmission of a satellite signal constitutes a separate violation.") (citing *Cablevision Sys. Corp. v. Doudlesox, Inc.*, CV 89–500 (DFJ) (E.D.N.Y. Aug. 24, 1989); *In re XX Broadcasting Corp.*, 5 F.C.C.2d 20 (1966)). As defendants note, that authority is not binding on this court.

Several cases from this district consider evidence of what the violators should have paid in calculating a baseline for damages. *See, e.g.*, *J&J Sports Prods., Inc. v. Dabrowski*, 2015 WL 9304347, *6 (N.D. Ill. 2015) (citing *That's Entm't*, 1996 WL 148045 at *3); *DirecTV, Inc. v. Schulien*, 401 F.Supp.2d 906, 916 (N.D. Ill. 2005)). That makes sense here, given that the only way to legally access Dish's Sport Plus signal in the United States is to pay Dish a monthly subscription fee. During the

13

relevant time period, the cheapest subscription fee that granted access to Dish's Sport Plus signal was $39.99 per month. At that same time, Ellas had approximately 2,300 customers who could view its redistribution of Dish's Sport Plus signal in January 2016 for a minimum of $34.99 per month. Instead of paying Ellas at least $80,477 per month,[11] Ellas subscribers should have been paying Dish at least $91,977 for authorized access to Sport Plus.[12] I also note that the monthly fees could have been as high as $160,954, if the subscribers would have elected the more expensive Dish package. In total, defendants should have paid Dish at least $459,885 for the five month period during which redistribution took place. Based on the monthly subscription unit, the duration of a single violation of the act was one month. Ellas stole the signal for five months, so there were five separate violations.

Since defendants engaged in a multi-step process to receive, unscramble, re-encode, and redistribute Dish's signal, and because defendants did not take reasonable affirmative steps to prevent the continued redistribution of Dish's signal after receiving the cease and desist letters, Dish urges the court to enhance the base damages assessed against defendants either by adding up to $100,000 per violation, or by multiplying the entire award by three or five. [27-1] at 11–15. In other words,

---

[11] Defendants argue that there is no evidence that they received any monetary gains. [29] at 13. Net gain is not a necessary predicate to an award of statutory damages, and there is evidence that defendants generated gross revenue by charging a subscription fee from its customers in order to access Ellas's services, which included the Sport Plus channel.

[12] Defendants argue that there is no evidence of their revenue during the relevant time period, and even if there were, it would be subject to a deduction for Ellas's reasonable expenses. [29] at 11 (citing 47 U.S.C. § 605(e)(3)(C)(i)(I)). Since Dish requested statutory damages, and not actual damages, Dish need not prove its losses or defendants' profits, though.

Dish proposes a statutory and enhanced damages award in the amount of $1,580,000 or $4,440,000 (using a per-day approach to the number of violations).

Defendants maintain that any violation was "innocent in nature" and should be punished in the amount of $250. [29] at 14 (citing 47 U.S.C. § 605(e)(3)(C)(iii)). Defendants point to Pappas's deposition testimony to support that point—Pappas said he did not intend to distribute Dish's signal on the app to other customers, he was just testing it himself; and that after he received the cease and desist letters, he tried to delete the channel from the box, but his efforts were stymied by technological difficulties; and that he also looked for other sources to provide the channel because he believed they had the redistribution rights. *Id.* at 15.

Nothing about defendants' actions was innocent. Pappas purposefully and surreptitiously engineered a way to make Dish's signal available on another platform, without Dish's authorization and in direct contravention of Dish's extensive protective measures. Pappas knew that signal theft was illegal, [29-3] ¶¶ 22–26, but he took these steps knowing that he had not obtained authorization from or provided any payment to the Sport Plus rights-holders. Even if Pappas had not had this background knowledge, the cease and desist letters made clear that his actions were illegal. His explanation of why he doubted the letters' message does not save him here. Pappas's attempts to delete the channel from the box service were halfhearted when viewed alongside evidence that he simultaneously sought to find other sources so that Ellas could continue to redistribute the channel. It was not reasonable for Pappas to think that Ellas could display the Sport Plus channel

when he knew he was not authorized to do so, nor was it reasonable for him to believe that these "other sources" had the Sport Plus distribution rights, which he could take and from which he could profit. Defendants acted in reckless disregard of the laws protecting the rights-holders of the Sport Plus channel, making their violations willful. *ON/TV of Chi. v. Julien*, 763 F.2d 839, 844 (7th Cir. 1985) (a violator acts willfully when he shows "disregard for the governing statute and an indifference for its requirements.") (citation omitted).

Based on the amount that should have been paid to Dish for the 2,300 customers' five months of access, and the willfulness of the five monthly violations, I find the maximum penalty for each willful violation, a total of $500,000, is appropriate. Defendants, and others like them, should be deterred from this easy act of theft that causes significant harm to providers like Dish. Dish is directed to submit a petition for attorneys' fees and costs, pursuant to Local Rule 54.3. The parties should confer on the requested permanent injunctive relief, and further briefing will be ordered if the parties cannot reach an agreement.

## IV. Conclusion

Defendants' motion for summary judgment, [27], is granted in part. Plaintiff's motion to withdraw, [31], is granted. Defendants' motion to strike, [32], is denied. Plaintiff is directed to submit a petition for attorneys' fees and costs. A briefing schedule will be set regarding injunctive relief, if necessary.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 12, 2018